USA v. Norman

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2014

(Submitted:  October 16, 2014                    Decided: January 9, 2015)

Docket No. 13-2840

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

DAVID NORMAN, a/k/a "Jim Norman,"

Defendant-Appellant.

_____

Before:  KEARSE, STRAUB, and WESLEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Katherine B. Forrest, Judge, convicting defendant of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and sentencing him to, inter alia, 20 years' imprisonment. Defendant challenges that aspect of his sentence, arguing principally that the court improperly increased his Guidelines offense level for number of victims, amount of loss, and leadership role, all principally based on his testimony at trial, while further increasing his offense level on the ground that he committed perjury at trial.  We find no error in the court's decisions to credit parts of defendant's trial testimony while finding other parts perjurious.

Affirmed.

PREET BHARARA, United States Attorney for the Southern District of New York, New York, New York (Andrea Surratt, Andrew Goldstein, and Karl Metzner, Assistant United States Attorneys, New York, New York, of counsel), for Appellee.

MEGAN WOLFE BENETT, New York, New York, for Defendant-Appellant.

DAVID NORMAN, Petersburg, Virginia, Defendant-Appellant, filed a Supplemental Brief pro se.

KEARSE, Circuit Judge:

Defendant David "Jim" Norman appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Katherine B. Forrest, Judge, convicting him of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and sentencing him to, inter alia, 20 years' imprisonment, to be followed by a three-year term of supervised release; he was also ordered to pay $1,731,805.34 in restitution and to forfeit $2,197,637.04. On appeal, Norman challenges only the imprisonment component of his sentence, contending chiefly that the district court erred in calculating his offense level under the Sentencing Guidelines ("Guidelines") by making findings that increased his offense level for his role in the conspiracy, the number of victims of his crime, and the amount of loss they sustained, all principally on the basis of his testimony at trial, while also finding that he committed perjury at trial and increasing his offense level for obstruction of justice. Norman also argues that his sentence is substantively unreasonable. Finding no merit in his contentions, we affirm.

## I.  BACKGROUND

In mid-2008, Norman, along with two codefendants, Olivia Jeanne Bowen and Noemi Dodakian, was charged in Count One of an indictment alleging conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, from early 2005 through the filing of the indictment.  Norman was arrested in Canada in 2009 and was extradited to the United States in 2011.  In the meantime, Bowen and Dodakian, who were also charged with a separate wire fraud conspiracy in Count Two of the indictment along with two other defendants but not Norman, were convicted on both of the counts against them--Bowen after a plea of guilty and Dodakian after a jury trial.

Norman was tried alone in a six-day jury trial in 2013.  The government's evidence at his trial showed that the conspiracy involved a supposed investment program called the "Jim Norman Program," which was an advance-fee scheme in which Bowen and Dodakian--whom, along with others, Norman called "facilitators" or his "team" (Trial Transcript ("Tr.") 837)--communicated with numerous persons and persuaded them to invest.  The facilitators (see Part II.C.3. below), and sometimes Norman himself, told prospective investors various stories as to the needs and purposes of the Jim Norman Program, principally representing that Norman had acquired or inherited many millions of dollars that were tied up overseas, much of it in accounts in his name or in the name of his nonprofit "Espavo Foundation" at the World Bank or the International Monetary Fund ("IMF").  Prospective investors were told that Norman needed relatively modest amounts of money to pay fees and taxes in order to liberate his millions.

Norman and his facilitators offered investors returns that were vastly disproportionate to the money to be invested and told them that their investments would be without risk, as Norman would give them promissory notes. For example, investors were promised that if they sent Norman $10,000, they would receive, within one week, the $10,000 investment plus $750,000. (See, e.g., Tr. 297, 327, 364, 546, 833.) Cindi Owen, a victim who, with associates, originally sent Norman $50,000, testified that they were promised that they would receive $2 million plus the return of the invested $50,000; Owen and her husband subsequently invested an additional $75,000 (obtained from a line of credit secured by their home), for which they were promised $2,250,000 plus the invested $75,000. (See id. at 62-63, 113.) Another victim testified that she and her husband invested $30,000 (funded by cash advances on credit cards) and were promised that they would be paid $1.98 million. (See id. at 320-21.)

No one who contributed to the Jim Norman Program received the promised payout. Few, if any, were even repaid their investments.

A. Norman's Testimony at Trial

At his trial, Norman testified and offered various explanations as to the means and goals of the scheme, contending that it was a valid investment program. A musician by trade, Norman testified that he initiated his investment program after receiving, in 2001 or 2002 (see Tr. 861), an email request for money from persons in the Ivory Coast with whom he had had no prior contact: "Desmond" (see id. at 687-89) and Desmond's mother and sister. Norman testified that Desmond said he and his mother and sister wanted to move to France; but they could not get their money--an "initial

4

sum of 17.4 million"--out of the Ivory Coast because that country lacked a suitable banking system. (Id. at 687.) They asked that Norman "be the recipient or the beneficiary of these funds and assist them in getting the money out into the Western banking system." (Id.) Norman was to retain a portion of that money for getting it out of Africa and was to send the remainder to Desmond and his family when they reached France.

In order to initiate any transfer of the funds belonging to Desmond, his mother, and his sister, however, "the manager of the[ir] bank" (Tr. 690; see id. at 866) requested "hundreds of thousands" of dollars in fees (id. at 690). Norman himself had no such assets; indeed, from 2001 through 2007 he was on the verge of bankruptcy. (See id. at 690, 723-26, 830-32, 896 (after the beginning of 2001, Norman was "broke").) Norman, a Canadian resident, testified that he therefore recruited facilitators, persons who were experienced in raising money in the United States. Among Norman's facilitators were Bowen and Dodakian; Linda Palmer, who worked with Bowen and Dodakian; and John Billingsley, who headed another fundraising group. (See id. at 697.) Norman testified that the facilitators succeeded in raising money from investors and sending it to accounts at the World Bank and the IMF. (See, e.g., id. at 698, 700-02, 780-83, 793-95, 812-13, 826.) He testified that they were so successful in raising money for Desmond that Norman was soon engaged to raise money to unlock accounts of others, including Desmond's brother David with $12.4 million, and an asset manager with $68 million, and another portfolio manager with more than $1 billion. (See, e.g., id. at 695-96, 878-79.)

Norman testified that he had email communications with officials of the World Bank and the IMF who repeatedly warned him that additional fees must be sent to those institutions in order

5

to preserve and unlock accounts established by Norman in his name or that of his Espavo Foundation. (See, e.g., Tr. 715-16 ("many" such emails from a Teresa Theo--also referred to as "Mrs. T"--whom Norman described as a representative of the IMF with respect to "economic affairs" relating to West Africa); id. at 785-89, 793-807, 812-13, 817-18.) The government, in its case-in-chief, had called as witnesses officials of the World Bank and the IMF, who testified that those institutions had no accounts in the name of either Norman or Espavo Foundation. (See id. at 400-03, 576-78.) The World Bank official testified that that institution did not maintain any accounts in the names of private individuals or nonprofit foundations; a person cannot wire money to the World Bank. (See id. at 400-01.) Nor did the World Bank have any record of employing the person Norman claimed to have dealt with at the World Bank. (See id. at 403.) Norman nonetheless testified that he and his facilitators sent to the World Bank and the IMF moneys demanded by those institutions for Norman's accounts, pointing to emails he claimed to have received containing such warnings and demands from European offices of the World Bank and the IMF. (See Tr. 785-89, 793-807, 812-13.)

On cross-examination, Norman held fast to his position that the emailed warnings and demands to which he pointed were from the World Bank and the IMF despite the fact that they were written in broken English. (See, e.g., Tr. 914-15, 946-47.) And he insisted that the emails were from those institutions' European branches despite being confronted with the fact that, to the extent that the emails revealed any place of origin, they showed that they originated on the west coast of the United States. (See id. at 911-14.)

Also on cross-examination, Norman testified that more than 100 people in the United States had sent him money for investments in the Jim Norman Program. (See, e.g., Tr. 833, 898.) He

testified that, in all, he had collected from those persons between $6 million and $9 million. (See id. at 840.) He testified that he "wrote promissory notes to the people on the wires coming in" (id. at 833), each with a specific deadline for payment (see id. at 915-17, 920-21). Norman admitted that all of the due dates passed without any investor receiving any payout. (See id. at 920-21; id. at 896 ("Nobody has been paid back.").)

Norman, however, who had no income of his own (see id. at 831, 850-51), spent many thousands of the invested dollars on himself. He maintained a bank account in the United States into which his investors wired money for the Jim Norman Program (the "Centura account"). From that account in November 2004 through March 2005, Norman withdrew nearly $87,000 in cash and made purchases totaling more than $168,000 with a debit card. (See Tr. 617-18; Government Exhibit ("GX") 327.) He spent, inter alia, some $5,700 on Gucci luggage (see Tr. 612, 850), nearly $7,900 to "update[]" his audio equipment (Tr. 853; see id. at 613), more than $20,500 for clothing (see GX 329, at 18-19; Tr. 611, 848-49 (to "updat[e]" his wardrobe)), more than $31,500 on furniture, art, and Persian rugs for his loft (see Tr. 612-13; Sentencing Transcript ("S.Tr.") 9-10), and bought a $180,000 Porsche truck (see Tr. 937-38) because he needed "transportation" (id. at 938).

Norman testified that he was still, during the trial, seeking investors for the Jim Norman Program (see, e.g., Tr. 896) and that he believed the promised moneys would be received (see id. at 829, 946-47). The jury found him guilty of wire-fraud conspiracy.

B. Sentencing

The presentence report ("PSR") prepared on Norman calculated that his Guidelines offense level was 37, without consideration of a possible increase for obstruction of justice, an issue as to which the PSR deferred to the district court. There was no dispute that Norman's criminal history category was I, as he had no prior criminal record. The Guidelines-recommended range of imprisonment for a defendant with that offense level and criminal history is 210-262 months; for Norman's offense, the top of the range was limited to 240 months because the statutory maximum prison term was 20 years.

After receiving the PSR and submissions from the parties, and hearing oral argument with respect to each side's objections to various offense-level calculations, the district court too concluded that Norman's Guidelines offense level was 37, although it did not reach that conclusion by exactly the same route as the PSR. The court found that Norman's base offense level was seven, see Guidelines § 2B1.1(a) (setting seven as the base offense level for a fraud offense for which the statutory maximum prison term is 20 years or more). The court added 18 steps pursuant to § 2B1.1(b)(1)(J) for a loss amount of more than $2.5 million but not more than $7 million; four steps pursuant to § 2B1.1(b)(2)(B) for an offense involving 50 or more, but fewer than 250, victims; two steps pursuant to § 2B1.1(b)(10) because the crime involved sophisticated means or was committed in substantial part from outside of the United States; four steps pursuant to § 3B1.1(a) on the ground that Norman was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive; and finally two steps pursuant to § 3C1.1 on the ground that Norman had obstructed justice both in his trial testimony and in posttrial letters he sent to the court. (See S.Tr. 23-27, 36.)

8

The court rejected objections by Norman to the increases based on (1) the amount of loss, (2) the number of victims, (3) the number of participants in, or the extensiveness of, his offense, and (4) obstruction of justice. As to the first three objections, the court noted that Norman himself testified that he had received between $6 million and $9 million and that none of his investors had been paid; that Norman testified that his investors numbered more than 100; and that Norman used numerous facilitators to obtain money from investors. The court stated that it could also have made the same findings as to loss amount even in the absence of such testimony by Norman, given the documentary evidence introduced by the government with respect to moneys flowing from investors into his Centura account.

With respect to the enhancement for obstruction of justice, the court found that numerous aspects of Norman's testimony were false, including his testimony as to how the Jim Norman Program came into being, his testimony that he sent moneys he received from investors to accounts at the World Bank and the IMF, and his testimony that he received numerous warnings and demands for additional sums of money from those two institutions (see S.Tr. 24-25). The court found that these and other false aspects of Norman's testimony were intended to influence the jury to vote for his acquittal. (See id. at 23-24.) The court also found that Norman, after trial and before sentencing, had attempted to prevent the imposition of a just sentence by sending the court letters containing false information (see id.; Letters from David Norman to Judge Forrest dated June 17 and July 9, 2013, Dkt. Nos. 266, 267, respectively). In these letters, Norman claimed that money for investors in the Jim Norman Program had arrived and that he needed to make travel arrangements for several of his associates so that the funds could be accessed. The court stated: "The letter to me

9

indicated some money had been received. There is no money. There are no accounts. The money has not been received. These are false statements. They are lies." (S.Tr. 26.) The court found that Norman had "acted consciously with a purpose of obstructing justice." (Id. at 26-27).

Although Norman argued that it was "internally inconsistent" for the court to rely on his testimony in order to increase his offense level for such factors as loss amount and number of victims while simultaneously imposing an obstruction-of-justice increase on the basis of his testimony (id. at 31; see id. at 22-23), the court rejected that argument. It pointed out that "[t]he law allows the finder of fact in a sentencing proceeding as . . . in other fact finding proceedings to credit some but not all of the testimony." (Id. at 23.) It stated that

> [o]f course some witnesses tell the truth sometimes and lie other times. Some lie all the time. Some never lie in their testimony. . . . Here, I believe there was a mixed bag. There was some perjurious testimony and there was some truthful testimony.

(Id.) The court stated that it "credited Mr. Norman's testimony to the extent that it was corroborated by other evidence." (Id. at 32.)

After considering the sentencing factors set out in 18 U.S.C. § 3553(a), the court concluded that imposition of the statutory maximum term of imprisonment was required in light of each factor (see S.Tr. 53). Taking those factors and the applicable advisory Guidelines range into consideration (see id. at 46-48), the court sentenced Norman principally to 240 months' imprisonment (see id. at 53). The court stated that it would have imposed that prison term irrespective of the Guidelines-recommended range. (See id.)

10

## II. DISCUSSION

On appeal, Norman pursues his contention that his sentence was substantively and procedurally unreasonable, arguing principally that the court could not permissibly rely on parts of his trial testimony to enhance his offense level for such Guidelines factors as amount of loss and number of victims, while rejecting other parts of his testimony as perjurious, requiring a further offense-level enhancement for obstruction of justice. (See Norman brief on appeal at 17-19.) He also argues that the court was not entitled to rely on his testimony as to the number of investors in his scheme or the total amount of loss he caused because his testimony was "inconsistent" (id. at 18), "unsubstantiated" (id. at 19), "extravagant" (id.), "insufficiently corroborated" (id. at 20), and "unreliable" (id.). We reject all of his contentions.

### A. Sentencing Procedure

Although the Guidelines are advisory, rather than binding on the district court, see United States v. Booker, 543 U.S. 220, 259-60 (2005), the court must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," Gall v. United States, 552 U.S. 38, 49 (2007). And "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Id. at 49-50. Those factors include the nature, circumstances, and seriousness of the offense; the defendant's history and characteristics; the need to deter the defendant from committing further crimes and to protect the public from further

crimes of the defendant; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. See, e.g., 18 U.S.C. § 3553(a).

We review the district court's sentencing decision for both substantive and procedural reasonableness. See, e.g., id. at 46, 51. Substantive-reasonableness review focuses principally on the district court's application of the § 3553(a) factors (see Part II.D. below) and is essentially review for abuse of discretion, see, e.g., Gall, 552 U.S. at 46, 51; United States v. Broxmeyer, 699 F.3d 265, 289 (2d Cir. 2012) ("Broxmeyer"), cert. denied, 133 S. Ct. 2786 (2013); United States v. Cavera, 550 F.3d 180, 187-89 (2d Cir. 2008) (en banc) ("Cavera"), cert. denied, 556 U.S. 1268 (2009). Procedural errors in sentencing would include "failing to calculate" the advisory Guidelines range, "improperly calculating" that range, "failing to consider the § 3553(a) factors," or "selecting a sentence based on clearly erroneous" factual findings. Gall, 552 U.S. at 51; see, e.g., United States v. Johnson, 567 F.3d 40, 50-51 (2d Cir. 2009).

The district court's factual findings at sentencing need be supported only by a preponderance of the evidence. See, e.g., United States v. Cossey, 632 F.3d 82, 86 (2d Cir. 2011); United States v. Salazar, 489 F.3d 555, 557 (2d Cir. 2007); United States v. Gaskin, 364 F.3d 438, 464 (2d Cir. 2004), cert. denied, 544 U.S. 990 (2005); United States v. Ben-Shimon, 249 F.3d 98, 102 (2d Cir. 2001). In reviewing a sentence, we will not overturn the district court's findings of fact unless they are clearly erroneous. See, e.g., United States v. Skys, 637 F.3d 146, 152 (2d Cir. 2011) ("Skys"); United States v. Garcia, 413 F.3d 201, 221-22 (2d Cir. 2005). We give "'due deference' to district court sentencing decisions, taking into account totality of circumstances." Broxmeyer, 699 F.3d at 289 (quoting Gall, 552 U.S. at 51).

> That deference derives from a respect for the distinct institutional advantages that district courts enjoy over their appellate counterparts in making an "individualized assessment" of sentence under 18 U.S.C. § 3553(a). Gall v. United States, 552 U.S. at 50, 51-52, 128 S.Ct. 586; accord United States v. Jones, 531 F.3d 163, 170 (2d Cir.2008). Among those advantages is a district court's unique factfinding position, which allows it to hear evidence, make credibility determinations, and interact directly with the defendant (and, often, with his victims), thereby gaining insights not always conveyed by a cold record. See Gall v. United States, 552 U.S. at 51-52 . . . .

Broxmeyer, 699 F.3d at 289. "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." United States v. Abiodun, 536 F.3d 162, 170 (2d Cir.) (internal quotation marks omitted), cert. denied, 555 U.S. 1020 (2008); see, e.g., United States v. Sash, 396 F.3d 515, 521 (2d Cir. 2005).

In the present case, the district court painstakingly calculated the Guidelines-recommended range of imprisonment, finding that the factual components of its calculations were supported by at least a preponderance of the evidence (see, e.g., S.Tr. 10, 12, 15 (loss amount of more than $2.5 million established by "well in excess of preponderance of the evidence"), id. at 36 (perjury supported by "clear and convincing" evidence; "[t]here is no doubt")). Norman's claims of procedural error are that the court improperly calculated his Guidelines offense level by (1) crediting parts of his trial testimony that required enhancement of his offense level while finding other parts perjurious, requiring a further enhancement of his offense level for obstruction of justice, and (2) making findings as to loss amount, number of victims, role, and intent to obstruct justice that Norman argues are clearly erroneous. None of his contentions has merit.

13

B.    The Claim of Inconsistent Treatment of Norman's Trial Testimony

Norman's contention that the district court could not permissibly enhance his Guidelines offense level based on parts of his trial testimony that it chose to credit and further enhance his offense level on the ground that he committed perjury is meritless. "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." Harris v. New York, 401 U.S. 222, 225 (1971). But the function of a trial is to seek the truth; and witnesses, before testifying, must give an oath or affirmation to testify truthfully, see Fed. R. Evid. 603. "[A] defendant's right to testify does not include a right to commit perjury." United States v. Dunnigan, 507 U.S. 87, 96 (1993); see, e.g., Nix v. Whiteside, 475 U.S. 157, 173 (1986); United States v. Havens, 446 U.S. 620, 626 (1980); United States v. Grayson, 438 U.S. 41, 54 (1978); Harris, 401 U.S. at 225 (the privilege of testifying "cannot be construed to include the right to commit perjury").

It is the job of the factfinder in a judicial proceeding to evaluate, and decide whether or not to credit, any given item of evidence. Whether, and to what extent, testimony that has been admitted is to be credited are questions squarely within the province of the factfinder. A jury is properly instructed that it is free to believe part and disbelieve part of a defendant's trial testimony. See, e.g., United States v. Gleason, 616 F.2d 2, 15-16 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980); see id. at 15 ("Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, . . . it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part." (emphasis added)); United States v. Vega, 589 F.2d 1147, 1154 & n.5 (2d Cir. 1978) (approving instruction to the jury that "[t]he testimony of an individual defendant is before you. You must determine how far

14

it is credited." (emphasis added)); United States v. Martin, 525 F.2d 703, 706 & n.3 (2d Cir.) (approving instruction to jury that "[i]t is for you to decide to what extent, if at all, defendant's interest has affected or colored his testimony" (emphases added)), cert. denied, 423 U.S. 1035 (1975).

With regard to factfinding in connection with sentencing, the judge who presided over the trial or over an evidentiary sentencing hearing is in the best position to assess the credibility of the witnesses, and her decisions as to what testimony to credit are entitled to substantial deference. See, e.g., Gall, 552 U.S. at 51-52 ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." (internal quotation marks omitted)); Broxmeyer, 699 F.3d at 289, 293-94; cf. United States v. Caracappa, 614 F.3d 30, 49 (2d Cir.) ("Given the district court's superior ability to make credibility assessments based on its first-hand observation of the witnesses at [an] evidentiary hearing [as to the defendant's decision not to testify], we defer to those assessments . . . ."), cert. denied, 131 S. Ct. 675 (2010); United States v. Iodice, 525 F.3d 179, 185 (2d Cir. 2008) ("giv[ing] particularly strong deference" to district court's findings after a suppression hearing where "credibility determinations are at issue"). And just as a jury is entitled to believe parts and disbelieve other parts of a witness's trial testimony, so is the sentencing judge. "Like any other factfinder who assesses witness credibility, the sentencing judge is free to believe all, some, or none of a witness's testimony." United States v. Candie, 974 F.2d 61, 65 (8th Cir. 1992). Norman has cited no authority--or logic-- contrary to this principle.

15

Punishment for perjury--*i.e.*, for "willful[ly]" giving "false testimony concerning a material matter," Dunnigan, 507 U.S. at 94--is essential to "the integrity of our trial system," id. at 97.

> The requirement of sworn testimony, backed by punishment for perjury, is as much a protection for the accused as it is a threat. All testimony, from third-party witnesses and the accused, has greater value because of the witness' oath and the obligations or penalties attendant to it.

Id. (emphasis added). Accordingly, when the sentencing court "proper[ly] determin[es] that the accused has committed perjury at trial, an enhancement . . . is required" for a correct calculation of the defendant's Guidelines offense level. Id. at 98.

The district court here expressly observed that, although the testimony of some witnesses is homogeneous with respect to truth or falsity, "some witnesses tell the truth sometimes and lie other times" (S.Tr. 23). The court found that Norman's testimony "was a mixed bag," containing "some perjurious testimony and . . . some truthful testimony." (Id.) The court described aspects of Norman's trial testimony that the court found were false and were intended to persuade the jury to acquit Norman (see Parts I.B. above and II.C.4. below); the court stated that it "credited Mr. Norman's testimony to the extent that it was corroborated by other evidence" (S.Tr. 32)--corroboration that is described in Part II.C. below.

The sentencing court was entitled to credit some parts and to disbelieve other parts of Norman's sworn testimony and to sentence Norman accordingly.

C. The Challenges to Specific Guidelines Determinations

We also reject Norman's contentions that the record was insufficient to support the court's findings that there were more than 100 victims of his crime, that their losses totaled more than

16

$2.5 million, that his crime involved five or more participants, and that Norman perjured himself at trial with the intent to obstruct justice.

    1.  <u>Amount of Loss</u>

The Guidelines require that the offense level of a defendant convicted of a basic economic offense such as conspiracy to commit fraud be calculated in part with reference to the amount of loss caused by his offense. For a loss amount of more than $2,500,000 but not more than $7,000,000, the offense level is to be increased by 18 steps. <u>See</u> Guidelines § 2B1.1(b)(1)(J). The sentencing court is not required to calculate the amount of loss with certainty or precision but "need only make a reasonable estimate of the loss" that is "based on available information." Guidelines § 2B1.1 Application Note 3(C); <u>see</u>, <u>e.g.</u>, <u>United States v. Bryant</u>, 128 F.3d 74, 75 (2d Cir. 1997). "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." Guidelines § 2B1.1 Application Note 3(C).

In finding that the total loss incurred by Norman's investors--all, or virtually all, of whom lost their investments--exceeded $2.5 million, the district court relied principally on Norman's testimony during his cross-examination and in response to questions from the court. After Norman testified that he had told a prospective investor that the Jim Norman Program had received more than $9 million (Tr. 839-40), explaining that $9 million was a "round figure" and that it "could have be[en] more, it could be less" (<u>id</u>. at 840), the court sought clarification from Norman:

        THE COURT: When you said it could be more, it could be less, would be less than 8 million or is it between somewhere 8-ish or above?

THE WITNESS: 6 to 9. . . .

THE COURT: But at least 6 is to the best of your recollection?

THE WITNESS: Yes, between 6 and 9.

(Id.)

Although Norman argues that it was procedural error for the court to rely on this testimony because, he now claims, it was "extravagant," "unsubstantiated," and "uncorroborated" (Norman brief on appeal at 18-19), his argument is legally and factually flawed. First, while the district court stated that it credited his testimony to the extent that it was corroborated, the court could have accepted it to the extent that the court found it credible even without corroboration; there is no requirement that a defendant's sworn testimony be corroborated before it can be credited. Any lack of corroboration for a witness's testimony--unless it is incredible on its face--goes merely to the weight of the evidence; the weight it is to be accorded is a matter for argument to the factfinder, not a ground for reversal on appeal. See, e.g., United States v. Morrison, 153 F.3d 34, 49-50 (2d Cir. 1998); United States v. Roman, 870 F.2d 65, 71 (2d Cir.), cert. denied, 490 U.S. 1109 (1989).

Second, Norman's recollection that the Jim Norman Program received between $6 million and $9 million was in fact consistent with other evidence at trial. The government introduced, without objection (see Tr. 615, 620), exhibits that summarized the investments wired to Norman's Centura account from 2002 through March 31, 2005 (see, e.g., GX 327, GX 328), moneys sent in ever-increasing amounts (see GX 327, at 1 (showing investments totaling $29,856.92 in 2002, $228,897.56 in 2003, $931,478.52 in 2004, and $924,764.40 in the first three months of 2005)). From December 2002 through March 2005, the Centura account received investments totaling

18

$2,114,997.40. (See id.) That account was closed by the bank after March 31, 2005 (see Tr. 721, 835), but Norman testified that he continued thereafter to solicit and receive investments (see id. at 835-36, 896). That testimony was corroborated by trial testimony from some of Norman's victims. (See, e.g., id. at 56-62, 92, 108 (Owen, her husband, and her associates invested $125,000 in July and August 2005); id. at 256-57 (Allan Title invested $50,000 in July 2005).)

Indeed, Norman, who was tried in 2013, testified that he was still soliciting and receiving investments in the Jim Norman Program as of the time of trial:

> Q. You . . . testified that well after this account was shut down in March 2005, you continued to raise money?
>
> A. Yes, to date.
>
> Q. To date?
>
> A. To date.
>
> Q. You're raising money?
>
> A. Yes.
>
> Q. Nobody has been paid back, correct?
>
> A. Nobody has been paid back.

(Tr. 896.)

> Q. When was the last time you worked on the project?
>
> A. This morning.

(Id. at 829.)

Having continued to solicit and receive investments, Norman testified that GX 327's tally of $2,114,997.40 received by the end of March 2005 severely underrepresented the total investments in the Jim Norman Program:

19

Q. The document that we saw in evidence yesterday made reference to approximately $2 million that were received. Was that the sum total of what was raised in your efforts to extricate these funds?

A. No, not even close . . . .

(Tr. 767.) The district court noted that if Norman's scheme continued to take in money at its 2005 rate, by the time of his indictment in mid-2008 he would have received more than $5 million in addition to the more than $2 million received prior to March 31, 2005. (See S.Tr. 16-17.)

There was no evidence that the sums invested by Norman's victims totaled less than the $6-9 million testified to by Norman. The district court did not err in finding that the loss amount was more than $2.5 million.

2. Number of Victims

The Guidelines define a "victim" to include "any person who sustained any part of the actual loss" (as contrasted with "intended loss," Guidelines § 2B1.1 Application Note 3(A)(ii) determined in the district court's calculation of the Guidelines loss amount. Guidelines § 2B1.1 Application Note 1. A four-step increase in offense level is prescribed if the offense of conviction involved at least 50 but fewer than 250 victims. See Guidelines § 2B1.1(b)(2)(B).

The district court found that Norman's offense fell into that category, based largely on GX 328, which listed well over 100 individuals who wired money to Norman's Centura account from November 2004 through March 2005. (See S.Tr. 17.) The court noted that although Norman testified "that he received small amounts from friends as gifts from time to time," he also testified "that he had no other significant source of income during the period of the scheme." (Id.) The court found that "all in all the wire transfer information lists a number of individuals that are far in excess of 50." (Id.)

Norman argues that GX 328 did not prove that his crime involved at least 50 victims because he was asked whether the persons listed in GX 328 "from A through Claire Olivrious [sic]" were "people wiring you money" (Tr. 896), and that A through Claire Oliverius comprised only some 20 persons (see GX 328, at 1). (See Norman brief on appeal at 21-22.) However, read as a whole, Norman's testimony about the persons listed on GX 328 was not limited to that small fraction of the list; Norman admitted that he was receiving investments from "[t]hese people, this long list of people" on GX 328, a list that "goes on for three pages" (Tr. 895, 896).

In any event, the district court found, "[i]n addition," that the existence of "well above 50" victims was established by Norman's explicit testimony at trial. (S.Tr. 17.) Norman testified that there were more than 100 investors in the Jim Norman Program (see Tr. 833), all of whom (see id. at 898-99, 920-21), or "[all but] maybe two or three" of whom (id. at 898), lost their investments. Although on appeal Norman contends that the court could not properly rely on his testimony because it was "vague and inconsistent" (Norman brief on appeal at 21) in that Norman said he had raised money from "[p]robably more than a hundred" people (Tr. 833) and later said that the number of investors was "200 off the top of [his] head" (id. at 898), Norman at no point testified that he had fewer than 50 investors, the threshold for the four-step enhancement. He testified in pertinent part as follows:

Q. More than a hundred people in the U.S. sent you money?

A. Probably more than a hundred.

Q. 200?

A. I wouldn't go that far, but I wouldn't round it off to a hundred.

21

(Id. 833.) When the court sought clarification as to how many people contributed to the Jim Norman Program not only directly to Norman but also through any of his facilitators, asking whether there were "200, 300, 400" (id. at 898), Norman testified as follows:

THE WITNESS:  200 off the top of my head really.

Q.  You already testified well more than a hundred?

A.  Yes, yes, yes.

Q.  Other than the two or three or maybe four people who got paid back their principal?

A.  Yes.

Q.  All these other hundred plus people, they didn't get paid back their principal, right?

A.  No.

(Id. at 898-99.)

Norman's testimony was neither vague nor inconsistent in stating that there were more than 100 investors in the Jim Norman Program--well over the 50-victim minimum required for the § 2B1.1(b)(2)(B) four-step offense-level increase.  There was no error in the district court's finding that there were at least 50 victims of Norman's offense.


3. Leadership Role

The Guidelines provide that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," his offense level is to be increased by four steps.  Guidelines § 3B1.1(a).  Norman does not suggest that he was not an

22

organizer or leader but rather contends that the district court made insufficient findings with respect to the scope of the activity and number of persons who were "participants" within the meaning of the guideline. Although the district court here found both prongs of § 3B1.1 to have been met (see S.Tr. 35), the standard for this increase is by its terms disjunctive, see Guidelines § 3B1.1(a); Skys, 637 at 151, 156; and we conclude that the findings and the record suffice with respect to the "five or more participants" standard, without needing to reach the question of whether the court's findings were sufficient with respect to the "otherwise extensive" standard.

A "participant" for purposes of § 3B1.1 is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." Guidelines § 3B1.1 Application Note 1. The defendant himself is to be counted as one of the participants. See, e.g., Skys, 637 F.3d at 158; United States v. Paccione, 202 F.3d 622, 625 (2d Cir.), cert. denied, 530 U.S. 1221 (2000). In imposing an enhancement for the defendant's role in the offense, the sentencing court must make findings sufficient to permit meaningful appellate review. See, e.g., Skys, 637 F.3d at 152.

Norman argues that the district court failed to make sufficient findings that four people other than himself were criminally responsible for the commission of the offense, rather than being "simply unknowing or unwitting participants." (Norman brief on appeal at 26.) This contention is contrary to the record. The district court found that the culpable persons who participated in Norman's scheme included Bowen, Dodakian, Palmer, Billingsley, Norman's longtime accountant John Bailey, and Norman's former girlfriend Ann Henshaw. (S.Tr. 19.) The record easily supports the finding that at least four of those persons were culpable participants in the crime rather than unknowing or unwitting pawns.

23

Bowen and Dodakian were in fact convicted of conspiring to commit wire fraud with Norman. As to other participants, the court noted that "defense counsel argued that Billingsley, Bailey and Henshaw are shown not to be part of the crime"; but the court stated that the testimony of "Norman himself makes clear that they were, in fact, part of it," and in addition that "the documentary evidence well and truly implicates these individuals repeatedly in the scheme." (Id.)

The record included evidence that Billingsley was a major solicitor for Norman and that it was at Billingsley's suggestion that Norman gave investors promissory notes (see Tr. 915-16). The notes promised the investors their extravagant returns within days; no such returns were ever paid; and Billingsley continued to solicit investors, to promise rewards within days, and to reassure them that there was no risk. For example, Dr. Gregory Rodriguez testified that, before investing in the Jim Norman Program, he had a conference call with Billingsley in late November or early December 2004 (see id. at 326), in which Billingsley told him he could make $750,000 profit on an investment of $10,000, and "[t]here was no risk" (id. at 327). After Rodriguez made an investment in December 2004, Billingsley called to ask him whether he could invest more. (See id. at 367.) Rodriguez made a second investment in January 2005, and Billingsley told him the promissory note would be paid within a week. (See id. at 377.) By that time, investments totaling more than $1.1 million had been wired into Norman's Centura account (see GX 327, at 1), and not a single investor had ever received the promised return. The evidence was ample to permit the finding that Billingsley was a knowing participant in Norman's fraud.

Henshaw, Norman testified, was one of the persons who helped him to keep the Jim Norman Program in operation after March 31, 2005, when his Centura account was closed by the

bank. (See Tr. 766, 835-36.) After that date, Henshaw allowed investors to wire money into her bank account, and she transferred money out as instructed by Norman. (See id.)

Even before Norman needed to have Henshaw use her account to receive and wire money in order to keep the Jim Norman Program in operation, however, he made six wire transfers to Henshaw from his Centura account in amounts ranging from $1,205 to $11,000: From November 22, 2004, through February 9, 2005, he sent Henshaw a total of $42,805 of investor money from that account. (See GX 327, at 3.) When Norman was asked why he made these transfers to Henshaw when he was operating the Jim Norman Program from the Centura account--and when he had no inkling that, many weeks later, the bank would cause the account to be closed--Norman gave no clear explanation. (See Tr. 846.) There was no evidence as to what Henshaw did with that money; the period in which she received it coincided with the period in which Norman was spending investors' money most lavishly on himself (see GX 329, at 18-25).

Although Norman testified that Henshaw had been his girlfriend several decades earlier and that they had become merely friends long before 2004-2005 (see Tr. 844, 725), Norman lived in Henshaw's condominium after he lost his own apartment in 2005 (see id. at 724-26); and Owen testified that in 2007 Norman told her that Henshaw was his girlfriend, sent Owen a picture of himself with Henshaw, and instructed Owen to wire money directly to Henshaw (see id. at 207-09). Norman testified that Henshaw allowed her own account to be used for the Jim Norman Program because she knew "there was an injunction against" Norman's bank account. (Id. at 766.) While a witness is normally not permitted to testify to the state of another person's mind, the district court was entitled to credit Norman's testimony that Henshaw knew there was an injunction barring use of his bank

25

accounts, for "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." Guidelines § 6A1.3(a). Norman's relationship with Henshaw--including his living in her condominium shortly after the closing of the Centura account, Henshaw's allowing her own account to be used to receive money from investors and wiring the money to others in accordance with Norman's instructions, and Henshaw's unexplained receipt from Norman of $42,805 of investor money before Norman had any idea that the use of her account would be needed for that purpose--provided such indicia.

On this record, we see no clear error in the district court's finding, by a preponderance of the evidence, that Henshaw too was a culpable, rather than an unwitting, participant in perpetrating the Jim Norman Program. Given the evidence as to Bowen, Dodakian, Billingsley, and Henshaw, the court did not err in finding that, including Norman, there were five participants in his crime.

4. Obstruction of Justice

The Guidelines provide, inter alia, that a convicted defendant's offense level is to be increased by two steps

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct.

Guidelines § 3C1.1. This enhancement applies to, inter alia, "committing . . . perjury," id. Application Note 4(B), and "providing materially false information to a judge," id. Application Note 4(F).

26

"A witness testifying under oath or affirmation violates" 18 U.S.C. § 1621, the federal perjury statute, "if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Dunnigan, 507 U.S. at 94. "[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same, under th[is] perjury definition." Id. at 95. "[I]t is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," but "[t]he district court's determination that enhancement is required is sufficient, . . . if . . . the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." Id.

In Dunnigan, the Court found that the sentencing court's findings that "'the defendant was untruthful at trial with respect to material matters in th[e] case'" and that her false testimony was "'designed to substantially affect the outcome of the case'" were sufficient to support a Sentencing Guidelines enhancement for obstruction of justice pursuant to § 3C1.1. Dunnigan, 507 U.S. at 95 (emphases in Dunnigan). In the present case, the district court found that numerous aspects of Norman's trial testimony were untruthful. Most prominent was Norman's insistence that he was soliciting investments in order to free up moneys that he and his Espavo Foundation held in accounts in European branches of the World Bank and the IMF and that he repeatedly received emails from those offices warning that additional fees were required in order to preserve and unlock those accounts. The court was not required to credit this testimony by Norman in the face of other evidence that revealed his mendacity. Witnesses who were officials of the IMF and the World Bank testified

27

that their respective institutions had no accounts in the names of Norman or his Espavo Foundation; that the World Bank does not maintain any accounts for private individuals or nonprofit foundations; and that the World Bank had no record of employing the individual with whom Norman claimed to have dealt. In addition, while Norman pointed to emails that he claimed to have received from European offices of those institutions demanding money, those emails, to the extent that they revealed any point of origin, indicated on their face that they originated from the west coast of the United States.

The district court credited the testimony of the World Bank and IMF witnesses and made explicit findings that Norman's testimony on these matters was intentionally false. It found that Norman testified about such "accounts . . . under oath. They were testified to exist at the IMF and at the World Bank. It is impossible for such accounts to exist at either of those institutions. That was discussed by Mr. Norman under oath." (S.Tr. 24.) The court found that

> the lies were so numerous and so brazen that it is breathtaking. He lied about the existence of third parties. He lied about the existence of what third parties told him. He lied about the location of third parties. When e-mails clearly indicated that they were located on the west coast on the face of the e-mails he testified that they were located in a far flung foreign jurisdiction.

(Id. at 25) The court found that Norman "acted consciously with a purpose of obstructing justice" (id. at 26-27) and that his "specific perjurious testimony [was] designed," if "credited[,] to have the[] jury acquit him of the charge of which he had been accused" (id. at 24 (emphasis added)). Norman's adamant adherence to his false testimony in the face of squarely contrary testimony from officials of the World Bank and the IMF as to the records and operating structure of those institutions--(see, e.g., Tr. 946-47 ("Q. You heard the testimony that the World Bank doesn't have any accounts for

individuals or foundations, correct? A. Yes, yes. . . . Q. You heard the testimony that those emails from Mrs. T were a fake; they were not real, right? A. Yes, I heard that. . . . Q. But it is your testimony today that none of that matters, that you still emphatically believe that [the Jim Norman Program] is real? A. Yes."))--supported the court's finding that Norman testified falsely by design, rather than as a result of confusion or mistake.

Finally, the district court correctly found that Norman's intentionally untruthful testimony centered on a material matter, for if indeed Norman and the Espavo Foundation had established accounts at the World Bank and the IMF, and if those institutions had, as Norman testified, demanded and received fees from Norman in order to unlock the moneys in those accounts, those facts would have seriously undermined the charge that Norman had conspired to commit wire fraud against investors.

In sum, we see no basis for overturning the district court's findings that Norman willfully perjured himself at trial for the purpose of obstructing justice.

Finally, we note that even if we were to identify any procedural error in the district court's Guidelines calculations--which we do not--we would find such an error harmless in light of the court's conclusion (see S.Tr. 53) that the appropriate sentence for Norman included the statutory maximum term of imprisonment regardless of the range of imprisonment recommended by the Guidelines.

D.  The Claim of Substantive Unreasonableness

In claiming substantive unreasonableness, Norman contends principally that his 240-month prison term was too long, considering that the prison terms imposed on Bowen (after a plea of guilty to two counts) and Dodakian (after a trial resulting in verdicts of guilty on two counts) were 63 and 95 months, respectively, and that Robert Ingram, the leader of the conspiracy charged in Count Two of the indictment, who had caused more than $7 million in losses, was sentenced to a prison term of 144 months. (See Norman brief on appeal at 35-36.) Norman also argues that the sentence was longer than necessary because he was 65 years of age at the time of his sentencing, had no prior criminal record (see id. at 35-37), and--according to his view--"did not profit substantially" from his crime (id. at 36). We find no merit in his contentions.

Where, as here, we have found no procedural unreasonableness in sentencing, our review of a claim of substantive unreasonableness is narrow, akin to review for abuse of discretion, see, e.g., Gall, 552 U.S. at 46; United States v. Coppola, 671 F.3d 220, 249 (2d Cir. 2012), cert. denied, 133 S. Ct. 843 (2013); United States v. Rigas, 583 F.3d 108, 121 (2d Cir. 2009), cert. denied, 131 S. Ct. 140 (2010); Cavera, 550 F.3d at 187-88. In conducting such review, we "evaluat[e] the length of the sentence imposed in light of the factors enumerated under 18 U.S.C. § 3553(a)." United States v. Ahders, 622 F.3d 115, 119 (2d Cir. 2010) (internal quotation marks omitted); see, e.g., United States v. Villafuerte, 502 F.3d 204, 206 (2d Cir. 2007). Consistent with abuse-of-discretion review,

> we will not substitute our own judgment for the district court's on the question of what is sufficient to meet the [18 U.S.C.] § 3553(a) considerations in any particular case. See United States v. Fernandez, 443 F.3d 19, 27 (2d Cir.2006). We will instead set aside a district court's substantive determination

30

only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions.

Cavera, 550 F.3d at 189 (emphasis in Cavera) (internal quotation marks omitted); see, e.g., United States v. Coppola, 671 F.3d at 249, 254; United States v. Rigas, 583 F.3d at 121-22.

In determining the prison term to be served by Norman, the district court stated that it had "taken all of the 3553([a]) factors into account to achieve . . . a sufficient but not greater than necessary sentence." (S.Tr. 47.) Adverting in part to its findings made in calculating Norman's Guidelines offense level (see id. at 48), the court stated that it had considered, inter alia, the "elaborate" nature of the fraud (id. at 52), the seriousness of Norman's crime, including its effect on his victims, some of whom had lost their homes and their livelihoods (see, e.g., id. at 50), and Norman's personal characteristics, including his willingness, without compunction, to defraud persons Norman knew were financially vulnerable (see, e.g., id. at 49-50) while he, as he testified at trial, inter alia, "bought a $180,000 car as transportation" (S.Tr. 50).

The court expressed particular concern for the need to protect the public and deter Norman from committing further frauds, in light of the "scope" and "duration of [Norman's] conduct" (id. at 49), which began as early as 2002 and persisted well into 2013. Norman himself testified that he was attempting to raise money for the Jim Norman Program even during the trial. (See Tr. 896.) The court had noted also that after being found guilty by the jury, Norman wrote letters containing "lies" to the court, "to try to con" the court "in the context of sentencing" by "indicat[ing that] some money had been received" for his investors (S.Tr. 26) and claiming that he merely needed to "raise money" to get that money here (id. at 51). The court concluded:

31

There's no doubt in my mind that if you were let out you would continue your scheme. Indeed, the e-mail that I received from the government this morning is indicative of your continuing your scheme. The letters you sent me are indicative of you continuing your scheme. Indeed, I think of it as your last big play trying to play the Court that the money has come in, . . . that at long last everybody's going to be paid out if only you can raise money for the air fare to get people to fly into town to support you but there's nobody running through the doors. That is where we are.

And you would engage in the fraud if I let you out in a nanosecond because you are engaged in fraud today.

(S.Tr. 51-52 (emphases added).) The court stated that the statutory maximum sentence of 20 years' imprisonment "is not necessarily sufficient" and that the court would impose a longer sentence if that were permissible, but that the maximum was "necessary" in order to prevent Norman from "continu[ing] the kind of criminal behavior [he had] been engaging in with so many victims." (Id. at 53.)

As to the need to avoid unwarranted sentencing disparities, the court pointed out that the person most comparable to Norman--Ingram, who was convicted of conspiring with Bowen and Dodakian as charged in Count Two of the indictment but not charged with Norman in Count One--had pleaded guilty and that his circumstances were unlike those of Norman. In particular, the court noted that, in addition to Ingram's acceptance of responsibility for his crime, there was no indication that Ingram had continued to pursue his fraudulent activity in the interim between his plea and his sentence. (See id. at 48.)

In light of this record, we cannot conclude that the sentence imposed on Norman was substantively unreasonable.

CONCLUSION

We have considered all of Norman's contentions on this appeal and have found them to be without merit.  The judgment of the district court is affirmed.